

The following constitutes
the order of the court. Signed August 2, 2013

Stephen L. Johnson
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

<table>
<tr><td>In re:</td><td>Case No. 09-51045 SLJ<br>Ch. 7</td></tr>
<tr><td>SAN JOSE AIRPORT HOTEL, LLC,<br><br>Debtor.</td><td></td></tr>
<tr><td>MOHAMED POONJA, TRUSTEE,<br><br>Plaintiff,<br><br>v.<br><br>SEVAK & SONS, L.P. et al.,<br><br>Defendants.</td><td>A.P. No. 11-5236 SLJ</td></tr>
</table>

## ORDER FOLLOWING TRIAL

Plaintiff's First Amended Complaint came on for trial on May 6 and 7, 2013. James A. Hennefer, Esq. appeared for Mohamed Poonja ("Plaintiff"); Gregory J. Charles, Esq., appeared for defendants Sevak & Sons, L.P. ("Sevak"), and Chandrakant Shah ("Shah", and collectively,

ORDER

-1-

"Defendants").  For the reasons stated below, the court finds that Shah breached the guaranty he signed and is liable for damages to Plaintiff.

**I.      FACTUAL BACKGROUND[1]**

    A.      <u>Basic Dispute</u>

    Debtor negotiated the sale of its real property asset, the San Jose Airport Hotel ("Hotel") to a company called Sevak and Sons, L.P.  The sale never closed because the parties did not get Bankruptcy Court approval for the terms.  This suit represents the bankruptcy estate's effort to recover from Sevak and Shah, a guarantor of the sale, for failing to close the sale.

    B.      <u>Major Players in Case</u>

        1.      <u>Mohamed Poonja</u>

    Mohamed Poonja is the chapter 7 trustee of this estate.  He was appointed by the United States Trustee after the case was converted from chapter 11 to chapter 7.  He is the plaintiff in this lawsuit.  He is represented by Mr. Hennefer.

        2.      <u>Manou Mobedshahi</u>

    Manou Mobedshahi, an immigrant from Iran, is a long time hotel executive with extensive experience in the refurbishment and sale of hotel properties.  He was the principal of Debtor San Jose Airport Hotel, which did business under the name Mobedshahi Hotel Group.

        3.      <u>Chandrakant Shah</u>

    Chandrakant K. Shah owned several hotel properties, and was an accomplished businessperson.  He offered to purchase the San Jose Airport Hotel from Debtor during its chapter 11 proceeding.  Shah was represented by Mr. Charles.

---

[1]      This order represents the court's findings of fact and conclusions of law, pursuant to FED. R. BANKR. P. 7052.  The court notes the parties filed an extensive Pre-Trial Statement in which they stipulated to numerous facts, which the court has reviewed and adopts.  Some of the facts admitted in the Pre-Trial Statement are not precisely germane to the issues before the court.  This decision summarizes and edits those facts to provide a factual basis for its decision.

ORDER

Case: 11-05236    Doc# 82    Filed: 08/02/13    Entered: 08/02/13 15:40:21    Page 2 of
24

4.      Sevak & Sons, L.P.

Sevak & Sons, L.P. was the entity which was expected to purchase the Hotel from Debtor. As it turns out, Sevak was never legally formed and thus has no existence.

5.      Jagdeep Victor Singh

Jagdeep Victor Singh is a real estate broker engaged by Mobedshahi to sell the Hotel. He lined up two buyers, Infinity Hotel Group, and Sevak/Shah. Neither buyer closed a sale.

6.      General Electric Capital Corporation ("GECC")

GECC lent Debtor the money to purchase the Hotel, and had extended that loan on two occasions. When it refused to extend the loan a third time, and commenced foreclosure proceedings, Debtor filed its bankruptcy case.

7.      Merle Meyers, Esq.

Merle Meyers was Debtor's chapter 11 bankruptcy lawyer. He is an accomplished lawyer who runs his own law firm. He had significant experience in chapter 11 cases, the negotiation of loans, and asset sales in chapter 11. He drafted the sale documents that are at issue in this case. Meyers and Mobedshahi negotiated the sale of the Hotel to Sevak/Shah.

C.      San Jose Airport Hotel

Debtor purchased the Hotel, a 512 room property located near the San Jose International Airport, in 1998, for approximately $13 million. At this time, Debtor was controlled by Mobedshahi. The Hotel was an old property in need of repairs and refurbishment. The Hotel had been operated as a Hyatt for many years but at some point before the bankruptcy filing, the Hotel changed flags and became a Holiday Inn.

The land under the hotel had independent value. Among other things, Mobedshahi believed the land had significant value as a redevelopment property. He had spoken to developers about dividing the parcel for additional development. Between 2005 and 2007, Trammell Crow Company indicated it would pay $92 million for the entire parcel and D.R. Horton once offered between $99 million and $101 million. Debtor did not accept these offers.

ORDER

D.    Financial Problems and Chapter 11 Bankruptcy Filing

GECC financed the purchase of the Hotel.  As was its custom, GECC extended Debtor a four year loan for the property, which was renewable.  The loan was renewed twice according to Mobedshahi.

By the time the third renewal would have been necessary, the Hotel was suffering financial problems and the GECC loan was delinquent.  Debtor negotiated with GECC in an effort to bring the loan current, and offered a variety of repayment schemes.  GECC was insistent that it be repaid.  Finally, Debtor negotiated a sale of the Hotel to a third party, Jay Shingal of Infinity Hotel Group, who offered to pay $73-75 million[2] for the property, subject to a loan from GECC.  Because Debtor knew GECC would reject any renewal of its financing, Debtor filed a chapter 11 bankruptcy case on February 18, 2009.  According to Mobedshahi, he had been advised by Meyers that it was possible to extend the GECC loan without GECC's permission using the bankruptcy laws. Unfortunately, the sale to Infinity Hotel Group failed. Debtor began marketing the Hotel for sale in chapter 11 with the assistance of its lawyer, Meyers.

E.    Sale to Sevak & Sons, L.P.

Given that the Infinity Hotel Group sale had fallen through, Debtor knew that it had to work quickly to resolve the chapter 11 case.  It determined, on Meyer's advice, that a sale to a new buyer should be arranged.  At this stage, Mobedshahi believed the Hotel still had significant value, even if it was no longer worth the $70 million Shingal offered.

Mobedshahi had worked with a real estate broker named Singh on the Shingal sale. Singh claimed to have familiarity with sale of hotel properties and the community of interested buyers for such properties.

As the Shingal sale was falling apart, Singh told Mobedshahi he had other potential buyers, including Shah.  Mobedshahi met with Shah and determined he was credible in terms of education and background.  On July 8, 2009, Shah signed a Commercial Property Purchase Agreement and Joint Escrow Instructions, offering to purchase the Hotel for $70 million,

---

[2]    The price depended on whether the sale was for cash or credit.

ORDER

-4-

composed of a $500,000 deposit, $23 million in buyer funds, a seller note of $45 million, and additional cash of $1.5 million. The $23 million in buyer funds apparently would have come from an assumption of the existing GECC loan.

Thereafter, the parties negotiated a Binding Letter of Intent ("LOI"), which they signed on July 29, 2009. Mobedshahi was assisted by Meyers in this effort. The LOI set forth the major business terms of the deal and superseded at least one prior version, and committed the parties to "negotiate, in good faith to finalize and sign a Purchase and Sales Agreement … by August 29, 2009."

The LOI specified that the Shah or his nominee would purchase the Hotel for the reduced price of $46 million. The price was to be paid as follows: $250,000 deposit at the time of the offer, $750,000 in cash at the time of closing, $500,000 in cash within six months of closing, $500,000 in cash within 24 months of closing, $24.25 million in cash within 36 months of closing, and $20 million, subject to certain reductions for early payment.[3] Somewhat confusingly, the LOI refers to a "note" being issued in connection with both the cash payments being made over time of $46 million, and with the $19.25 million balance due.[4] The LOI also specified that Shah would personally guarantee "all obligations under the note, other than the $26,000,000" and would offer all his real property as collateral, with the exception of his personal residence at 26725 Shady Oak Lane, Los Altos Hills, CA.

Finally, the LOI provides that "Mr. Shah agrees to provide a signed personal financial statement to the seller's attorney on or before August 1, 2009." In that connection on July 29, 2009, Shah signed a Small Business Administration form "Personal Financial Statement," in which he stated his net worth was $23.895 million, composed of $700,000 in cash, $1.1 million

---

[3]    The balance under this calculation would appear to exceed the purchase price by $250,000 but this discrepancy is not explained.

[4]    The LOI states "The Purchase Price shall be paid as follows, in cash and pursuant to a secured promissory *note*:" and later "With respect to the remaining $19,250,000 balance, the following terms apply: Buyer agrees to pay monthly interest … [and] may add accrued interest to the principal of the *note* …"

ORDER

-5-

in individual retirement accounts, $2.5 million in life insurance cash surrender value, $1.65 million in stocks and bonds, $28.7 million in real estate, $80,000 in automobiles, and $250,000 in other assets, net of liabilities of $11.085 million. The Personal Financial Statement identified five parcels of real property owned by Shah, including his residence, the Sundowner Inn, a ranch, an office building, and a shopping center.

Meyers testified credibly about discussing the deal points with Shah and the various lawyers retained by Shah. Meyers indicated he explained in detail the mechanism of obtaining Bankruptcy Court approval of the sale. He told Shah what would be required in the event that GECC objected to the sale. He explained that if GECC's loan was going to be assumed in the process of the sale, Debtor would be required to demonstrate that the proposed purchaser had the financial wherewithal to close the transaction and make the payments due to GECC. He told Shah the court would need to rely on Shah's experience as a hotel operator and his financial condition to find the sale protected GECC's interests as a lender.

On August 10, 2009, Debtor filed an application to employ Olingers Real Estate Investments, Inc., and its agent Singh to sell the Hotel to a new buyer.[5]

F.    The Purchase and Sale Agreement (Original Version)

On September 4, 2009, the parties signed the Purchase and Sale Agreement ("PSA") for the sale of the Hotel. The signatories to the PSA were Debtor, Shah (individually), Mrudula Shah (Shah's spouse),[6] and Sevak,[7] for which Shah signed as "Chief Executive Officer." Debtor was identified as the "Seller" and Sevak was identified as the "Buyer". The PSA called for a sale of the Hotel for $46.2 million to Sevak. The PSA indicated that the purchase price would be paid using the following sources: (1) cash of $750,000, and (2) a secured promissory note for $45.45 million. The promissory note was to be secured by all the property of the Hotel and the Holiday Inn franchise agreement. Shah agreed to execute a guaranty of the transaction.

_____

[5]    The application to employ was never approved as it was withdrawn on January 6, 2010.

[6]    Mrudula was dismissed on her motion from this lawsuit prior to trial.

[7]    Shah testified that Sevak is a family name.

ORDER

-6-

The PSA required a non-refundable deposit of $250,000 be made at the time the PSA was signed. This deposit was made and the funds are being held at First Republic Title. The PSA required an additional deposit of $250,000 prior to the start of the hearing on approval of the sale to Sevak by the Bankruptcy Court. A cashier's check was tendered at the commencement of that hearing, but the funds no longer appear available.[8]

The PSA contained a number of representations and warranties by Sevak. At § 6.2.1, it represented that "Buyer [Sevak] is legally and properly formed entity existing under the laws of the State of California, and has full power and authority to execute, deliver, and perform its obligations under this Agreement." At § 6.2.4, Sevak promised to "actively and fully assist Seller in obtaining Bankruptcy Court approval, as required by Seller, including without limitation by providing complete financial, experiential and strategic information and testimony that will support adequate assurance of future performance under the Holiday Inn Agreement, the qualifications of Buyer and Mr. Shah as operator and owner of the Holiday Inn Property and as a franchisee from IHG (by assignment), and the adequacy of protection of the interests of GECC."

In a section entitled "Recitals," the PSA outlined certain personal financial information for the Shahs. It identified, in paragraphs I-M, an Office Property, a Ranch Property, the Sundowner L.P. and Sundowner Hotel Property, and described these as the "Shah Collateral Properties." The Shahs agreed to pledge their interests in these properties (and to cause Sundowner L.P. to pledge its assets) as "collateral to secure full repayment of the Buyer Note."

The sale was conditioned on the approval of the Bankruptcy Court at § 4.2.5, and contained an integration clause at § 9.10.

---

[8] The exact disposition of these funds is not clear. Meyers testified that he received this check from Shah through Mobedshahi, but was not authorized to cash it because the sale was not approved. He gave the check to Poonja. The Pre-Trial Statement indicates that "counsel for SJAH, LLC" is holding a cashier's check for $250,000, but the testimony at trial suggested that Shah asked the bank to cancel and re-issue the check. The judgment in this case will reflect the amount due in toto; if the funds are still available to Poonja, he can use them to reduce the judgment.

ORDER

-7-

Because the sale was almost all non-cash consideration, Debtor and Meyers determined that Shah would need to guaranty the PSA. Shah agreed to this. Shah signed a Limited Guaranty ("Guaranty") to support the purchase of the Hotel. In that Guaranty, Shah "HEREBY IRREVOCABLY AND UNCONDITIONALLY GUARANTEES AND PROMISES to Seller the payment and prompt performance of each and every covenant, warranty, representation, provision, obligation, term and condition made or to be kept or performed by the Buyer … by the Obligor … by the Trustors … or by the Debtor … and contained in any Sale Documents, and all liabilities, direct or contingent, joint, several or independent, arising in connection with any of the Sale Documents, including all liabilities of any assignee or successor in interest of the Buyer, Obligor, Trustors or Debtor …" (emphasis in original). It further provided that Shah waived the protections of California Civil Code §§ 2809 and 2810. Shah's liability under the Guaranty is limited to $20 million.

G.     First Amendment

On October 9, 2009, Debtor and Shah executed amended sale documents. The Amendment to Purchase and Sale Agreement (the "First Amended PSA") indicates that Debtor has become aware of a "mistake" in the identification and title to Shah's ranch property, and includes changes to the collateral Shah was offering to Debtor in connection with the purchase of the Hotel. It modified the parties' obligations regarding the treatment of executory contracts with a local labor union and Holiday Inn, which is referred to as IHG. Shah signed another Limited Guaranty dated October 12, 2009 (the "Amended Guaranty"), in connection with the First Amended PSA, with substantially the same terms as the original Guaranty.

On October 12, 2009, Shah executed the Declaration of Chandrakant Shah in Support of Debtors' Motion to Approve Sale of Real and Personal Property Free and Clear of Liens, Claims, and Interests ("Shah Declaration"). In that Declaration, Shah represented that he had a "personal net worth" of approximately $24 million, consisting of real property ownership interests, stocks, cash, and other assets. The document was filed with the court, but Shah later disavowed it, telling parties that it was not accurate.

ORDER

H.    Relief from Stay

GECC continued to press for repayment during the bankruptcy proceeding. On October 7, 2009, GECC filed a motion requesting an order terminating the automatic stay arising under 11 U.S.C. § 362(a) so it could complete its scheduled foreclosure sale of the Hotel. GECC contended that the value of the Hotel was only $15 million.

I.    Bankruptcy Court Approval

On October 14, 2009, Debtor filed a Motion to Approval Sale of Real and Personal Property Free and Clear of Liens, Claims and Interests ("Motion to Sell"), seeking authority to sell the Hotel to Sevak under the terms of the PSA. GECC objected to the Motion to Sell, raising concerns about the viability of the proposed sale.

J.    Second Amendment

In an effort to address GECC's concerns and obtain Bankruptcy Court approval, the parties determined to modify the proposed sale a second time. On November 10, 2009, the parties executed a Second Amendment to the Purchase and Sale Agreement (the "Second Amended PSA"). The Second Amended PSA noted that Debtor had moved the Bankruptcy Court for an order approving the sale of the Hotel, that GECC had objected to the proposed sale, and that the Bankruptcy Judge[9] had expressed concerns about the terms of the sale. The Second Amended PSA required that Shah, or his designee, increase the cash down payment to $2 million, and required a promissory note of $44.2 million. The Second Amended PSA authorized Mobedshahi to make advances of $1.25 million to Debtor at the time of closing, and $750,000 to Debtor on the first anniversary of the closing. These funds were to be paid to GECC to reduce its secured claim. The funds effectively covered the $2 million down payment required of Shah at the close of the sale.

Although not addressed in the Second Amendment, Meyers testified that it was Debtor's intention to assign the promissory note that Sevak would execute in support of the sale to GECC. Debtor would also assign the deed of trust executed by Shah. None of the documentary

---

[9]    Judge Efremsky was assigned the main bankruptcy case prior to his transfer to the Oakland Division. The main case was re-assigned to Judge Johnson in October 2010.

ORDER

-9-

evidence introduced at trial supported this point, but it was not refuted at trial. In any event, this mechanism was necessary to sell the Hotel free and clear of GECC's lien, pursuant 11 U.S.C. § 363. GECC remained interested in the sale of the Hotel because of the financial structure of the deal and the importance of Shah's guaranty. This is also why Debtor required financial information from Shah.

The hearing on the Motion to Sell was set for November 16, 2009. Meyers testified that Debtor's side considered the hearing a success as the Bankruptcy Court indicated that it might approve a sale free and clear of liens under 11 U.S.C. § 363(f), subject to compliance with applicable laws. The Bankruptcy Court indicated that it would need evidence to support Shah's claimed financial wherewithal and his experience as a hotel operator.

Given GECC's objection, Debtor and GECC stipulated to continue the hearing on December 16, 2009, to allow Debtor to firm up some of the financial information supporting the sale.

K.    Attempts to Obtain Further Financial Information from Shah

Immediately after the November 16, 2009 hearing, Meyers began working to solidify the evidence to support the proposed sale. Meyers testified credibly that after signing the PSA, and failing to obtain GECC's approval of the proposed sale, he attempted—repeatedly—to get further information from Shah to support a conclusion that he was financially capable of closing the sale of the Hotel, and performing under the GECC loan. This included appraisals of Shah's real properties. Meyers testified that he knew Bankruptcy Court approval would be difficult without improved financial information.

L.    Sale Collapses

Prior the December 16, 2009 hearing on the Motion to Sell, as well as during and after that hearing, as noted, Meyers worked diligently to obtain further financial information from Shah. He sought appraisals of Shah's property. Through Meyers, Debtor requested Shah execute a third amendment to the PSA, which would quantify clearly Shah's financial resources. In the end, Shah refused to provide further financial information. He also refused to execute a third amended PSA.

ORDER

Case: 11-05236    Doc# 82    Filed: 08/02/13    Entered: 08/02/13 15:40:21    Page 10 of 24

1    Shah testified at trial that by late 2009, providing the information Debtor requested

2    would have been pointless. At that time, he claimed, his financial fortunes had turned, and he

3    was not worth $23.895 million, but significantly less. He pointed to the large drop in value of

4    the Hotel as evidence that his own real estate assets had declined substantially in value. He

5    refused to cooperate to provide further financial information to Debtor and did not offer further

6    evidence of his experience.

7    At this point, Debtor declared Sevak and Shah to be in breach of the Second Amended

8    PSA and Guaranty. With minor exception, there was no further communication between the

9    parties. The chapter 11 case was converted to chapter 7 on May 7, 2010, and Poonja was

10    appointed trustee at that point.

11    Ultimately, the Hotel was foreclosed by GECC. The estate received nothing from the

12    foreclosure proceeds.

13    M.    Debtor Relied on Shah's Representations and Warranties

14    Debtor and Mobedshahi relied on Shah's representations in the PSA, First Amended

15    PSA, and Second Amended PSA. At the point the agreements were initially negotiated, Sevak

16    did not exist. Thus, Debtor and Mobedshahi were relying on Shah's statements regarding his

17    interest in the Hotel, his wherewithal to purchase the Hotel, the formation of his new company

18    Sevak, and for Sevak's expected performance under the PSA. Under the circumstances, their

19    reliance was reasonable. While Shah may have utilized a somewhat unconventional means of

20    showing his personal assets, a Small Business Administration form, Mobedshahi testified

21    credibly that he believed, based on Shah's representations, that Shah had the ability to purchase

22    and run the Hotel.

23

24

25

26

27

28

ORDER

N.     Damages

Plaintiff contends that he is due the following in damages:

**Damages from Failed Sale -- San Jose Airport Hotel**

| | | |
|---|---|---|
| Agreed purchase price | | $46,200,000 |
| Less: | Amount due to GECC | $34,709,242 |
| Net to Debtor | | $11,490,758 |
| Less: | Brokerage fees due at Sale | $1,000,000 |
| | Escrow Fees | $462,000 |
| Net due from sale | | $10,028,758 |
| Plus: | Interest Earned | <u>$1,620,000</u> |
| Net Damage Claim | | <u>$11,648,758</u> |

Defendants did not contest the calculation of damages, only Plaintiff's entitlement to them.

## II.     DISCUSSION

A.     Authority to Enter Final Order

The court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334 and 157(b).  This case involves the sale of estate property to a third party by an estate representative.  The transaction took place during the course of the chapter 11 case.  On this record, this is clearly a core matter within the meaning of § 157(b), and the court has the constitutional power to enter a final order.  In addition, no party has objected to the court entering a final order.  In the Answer, Defendant admitted "this court has jurisdiction to hear and to determine this proceeding and to enter an appropriate order or orders and judgment or judgments."  (*see* docket nos. 33 and 36).  *See Bellingham Ins. Ag., Inc. v. Arkinson (In re*

ORDER

1    *Bellingham Ins. Ag.*), 702 F.3d 553, 567 (9th Cir. 2012) (noting that parties may consent to

2    entry of a final judgment).

3         B.    <u>Sevak did not have the Capacity to Execute the PSA</u>

4         Plaintiff contends that Sevak breached the PSA and should be liable for damages for that

5    breach.  The court concludes Sevak did not breach the PSA because the legal entity called

6    Sevak was never properly formed and therefore did not have the capacity to contract.

7         The Supreme Court of California has defined a contract as "[A] voluntary and lawful

8    agreement, by competent parties, for a good consideration, to do or not to do a specified thing.

9    *Robinson v. Magee*, 9 Cal. 81, 83 (1858).  A contract can only be formed by parties who have

10   the capacity to contract.  Under California law, a contract must include the following elements:

11   (1) parties capable of contracting; (2) their consent; (3) a lawful object; and (4) sufficient cause

12   or consideration.  Cal. Civ. Code § 1550.  Thus, a party must prove any counterparty had the

13   capacity to contract.

14        Sevak was intended to be a limited partnership, according to the PSA.  California law

15   requires that a limited partnership be formed by filing a certificate of limited partnership with

16   the Secretary of State, and that the partners enter into a partnership agreement.  Cal. Corp. Code

17   § 15902.01.[10]  Prior to trial, Plaintiff conceded that Sevak was not properly organized, did not

18   have organizational papers, and never operated as a limited partnership.

19   _____

20   [10]    Section 15902.01 states:

21        (a) In order for a limited partnership to be formed, a certificate of limited partnership

22   *must be filed* with and on a form prescribed by the Secretary of State, and, either before
     or after the filing of a certificate of limited partnership, the partners shall have entered

23   into a partnership agreement. The certificate must state:

24        (1) the name of the limited partnership, which shall comply with Section

25   15901.08;

26        (2) the street address of the initial designated office;

27        (3) the name and street address of the initial agent for service of process in

28   accordance with paragraph (1) of subdivision (d) of Section 15901. 16;

ORDER
                                                  -13-

Because Sevak was not properly formed, it did not have the capacity to execute the PSA, and the PSA is not a valid contract. Sevak did not breach the PSA because the PSA was not a valid contract.

C.     <u>Shah Breached the Guaranty</u>

    1.     <u>Breach of the Guaranty's Adoption of PSA's Representations and Warranties</u>

The PSA contained representations and warranties by Shah. A warranty is an "assurance by one party to an agreement of the existence of a fact upon which the other party may rely; it is intended precisely to relieve the promisee of any duty to ascertain the facts for himself. Thus, a warranty amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue." *Dale Constr. Co. v. United States,* 168 Ct. Cl. 692, 699 (1964); *see also Paccon, Inc. v. United States,* 399 F.2d 162, 166-67 (Ct. Cl. 1968) (quoting *Dale Constr. Co. v. United States).*

Shah guaranteed Sevak's obligations under the PSA. In particular, Shah warranted §§ 6.2 and 6.2.1 of the PSA, under which Sevak stated that it was a "legally and properly formed entity existing under the laws of the State of California," empowered to "execute, deliver and perform its obligations" under the PSA. This representation was false because Sevak was never properly formed as a limited partnership and did not have the capacity to contract. Shah also breached § 6.2.4 of the PSA, in which he promised that Sevak would "actively and fully assist [Debtor] in obtaining Bankruptcy Court approval, including without limitation by providing complete financial … information and testimony that will support … the adequacy of protection of the interests of GECC." As noted, Debtor requested such information and Shah did not supply the information requested.

_____

    (4) the name and the address of each general partner; and

    (5) the mailing address of the limited partnership, if different from the address of the initial designated office.

(emphasis added).

ORDER

-14-

Shah contends he did not breach his obligation to support Debtor's attempt to have the sale approved by the Bankruptcy Court, but the court disagrees.  Prior to the sale, as noted above, Shah  refused to provide information requested by Debtor and Meyers.  Shah had an obligation to "actively and fully assist" Debtor in obtaining information, which included financial information.  Shah breached the PSA by refusing to cooperate in the effort to assist with Debtor's efforts to get the sale approved.   Shah argues that he could not demonstrate that he was worth $23.895 million because, by the time of the sale in late 2009, his properties had fallen in value, just as the Hotel had.  He claims it would have been futile for him to supply information because the information he would have supplied would not have been sufficient for the court to approve the sale.  But this argument misses the point.  It was the refusal to cooperate—not Shah's inability to prove that he was worth $23.895 million—that is the heart of Shah's problem.  Nowhere in the sale documents was Shah required to prove he had $23.895 million in net assets.

Shah maintained at trial that he complied with his obligations under the PSA.  In Shah's view, the failure to secure court approval is Debtor's fault alone, which was a breach of Debtor's obligation under the PSA.  The court rejects this view because Debtor did everything it could to obtain Bankruptcy Court approval.  The PSA and the Guaranty made clear that Shah was required to cooperate with Debtor's effort to secure Bankruptcy Court approval for the Hotel's sale.  Shah failed to cooperate with Debtor's efforts by refusing to provide "completely financial, experiential, and strategic information and testimony" in support of the sale.  (PSA § 6.2.4).   Thus, Shah is responsible for Debtor's failure to have the Bankruptcy Court approve the proposed sale.

2.    The Guaranty was not Exonerated

Shah argues the Guaranty was exonerated.  He contends that Debtor attempted to negotiate a third amendment to the Guaranty to specify Shah's assets, that Shah refused to sign the amended guaranty, and that "any suretyship obligation was exonerated."  He relies on *Bennett v. Leatherby*, 3 Cal. App. 4th 449, 452 (1992), but the facts of that case are entirely distinguishable.

ORDER

-15-

In *Bennett v. Leatherby*, a landlord settled a long term lease dispute with two tenants and gave them general releases. The Court of Appeal held the landlord could not obtain a judgment against a guarantor because the settlement with the tenants exonerated the guarantor. Relying on California Civil Code Section 2819, the court found that a party to a contract "exonerates a surety if the creditor, without the surety's consent, alters the 'original obligation' or impairs or suspends the creditor's 'remedies or rights' against the debtor. The statute serves to release a guarantor whose subrogation rights against the debtor are impaired." *Bennett v. Leatherby,* 3 Cal. App. 3d at 452. This case is different. No settlement occurred to limit Shah's ability to collect from Sevak, the ostensible principal. Moreover, the argument is inconsistent with Shah's assertion that Sevak had no capacity to contract: if Sevak had no legal existence, any agreement with Sevak to alter or amend the original contract would itself be a nullity, and would have no effect on Shah's obligations under the Guaranty.

Under § 2810 of the California Civil Code, a surety may be excused from performance if his principal suffers a disability. But Shah waived the protections of § 2810 in the Guaranty. While caselaw in California indicates that a surety cannot waive the protections of § 2810 when the underlying contract is void, *WRI Opportunity Loans II, LLC v. Cooper,* 154 Cal. App. 4th 525 (2007), involving a claim of unlawful usury, that case has no application here. The PSA is not void and had a proper, lawful object. Shah cannot defend himself from liability by asserting Sevak's lack of capacity.

By its terms, § 2810 does not apply anyway. Section 2810 states: "a surety is liable, notwithstanding any mere personal disability of the principal, though the disability be such as to make the contract void against the principal; but he is not liable if for any other reason there is no liability upon the part of the principal at the time of the execution of the contract, or the liability of the principal thereafter ceases, unless the surety has assumed liability with knowledge of the existence of the defense." Cal. Civ. Code § 2810 (emphasis added).

To the extent Shah argues he was exonerated because Sevak was disabled from meeting the terms of the PSA, his argument is not persuasive. In *Post Bros. Constr. Co. v. Yoder,* 20 Cal.3d 1 (1977), California's Supreme Court construed § 2810 to mean a "surety is entitled to

ORDER

-16-

[a] principal's defenses other than personal defenses unless [it] assumed liability with knowledge of the defenses." *Id.* at 8.  Personal disability often means death or bankruptcy.  *R.P. Richards, Inc. v. Chartered Const. Corp.,* 83 Cal. App. 4th 146, 155 (2000).  Sevak did not suffer a personal disability like the kind referred to in § 2810.  Sevak suffered from a more fundamental disability, a failure to ever be formed properly.

The point is that Shah would have known that Sevak did not have the capacity to contract.  Shah inserted Sevak into the sale transaction.  He knew that it had not been properly formed and relies on that point to claim he has no responsibility. The court determines Shah executed the Guaranty with a complete understanding of Sevak's corporate status.  Shah cannot rely on Sevak's unformed status to claim he has no responsibility under the Guaranty.

It also does not matter that Sevak had no capacity to contract under California law at the time the PSA was executed.  Section 2825 of the Civil Code exonerates a surety if the principal is exonerated *by operation of law*.  It would apply where a contract was illegal or became unenforceable due to reasons of public policy.  The statute has application here as the contract was lawful.  Under California law, the simple fact that Sevak did not have the capacity at the time the PSA was signed does not exonerate Shah, the guarantor.

      3.     <u>Shah has Greater Liability than Sevak because he Waived the Protections of California Civil Code § 2809</u>

The general rule of suretyship is codified at § 2809 of California's Civil Code.  Section 2809 states that a surety's liability cannot exceed that of his principal.  Cal. Civ. Code § 2809; *Fort Bragg Unified School Dist. v. Solano County Roofing, Inc.*, 194 Cal. App. 4th 891, 917 (2011).  A surety's obligation consists of "all the covenants and obligations in its contract . . ." *Id.*  Section 2809 does not apply in this case because Shah waived the protections of § 2809 when he signed the Guaranty.

Sevak's liability under the PSA would have been limited to $500,000 as the agreement included a liquidated damages provision.   But that provision did not control Shah's liability.  Shah's liability under the PSA and Guaranty was set at $20 million.  The court determines this was the outside limit of Shah's liability as the express terms of the Guaranty indicate that

ORDER

-17-

1   limitation.  The court finds that Plaintiff's damages are significantly less than $20 million, and

2   the limitation therefore has no application.

3       D.      The Fraud Claim is not Barred by the Economic Loss Rule but is not Supported

4               by the Evidence

5       Shah contends Plaintiff's claim of fraud is barred by the economic loss rule.  "The

6   economic loss rule requires a purchaser to recover in contract for purely economic loss due to

7   disappointed expectations, unless he can demonstrate harm above and beyond a broken

8   contractual promise."  *Robinson Helicopter, Inc. v. Dana Corp.*, 34 Cal. 4th 979, 989 (2004).  A

9   party may allege tort damages, however, if it can prove the violation of a duty "independent of

10  the contract arising from the principles of tort law.  *Id.*  Tort damages have therefore been

11  permitted in contract cases "[W]here a breach of duty directly causes physical injury; for breach

12  of the covenant of good faith and fair dealing in insurance contracts; for wrongful discharge in

13  violation of fundamental public policy; or where the contract was fraudulently induced."  *Id.* at

14  999, *citing Erlich v. Menezes*, 21 Cal. 4th 543, 551 (1999)(citations omitted).  According to the

15  California Supreme Court, a tortious breach of contract can occur if "(1) the breach is

16  accompanied by a traditional common law tort, such as fraud or conversion; (2) the means used

17  to breach the contract are tortious, involving deceit or undue coercion; or (3) one party

18  intentionally breaches the contract intending or knowing that such a breach will cause severe,

19  unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential

20  damages.' *Id.,* at 553-554.  Thus, a fraud claim such as the one Plaintiff is asserting here, could

21  fall outside the prohibitions of the economic loss rule.

22      To determine whether Plaintiff proved a fraud claim, the court turns to the elements of

23  that claim and the applicable burden of proof.  In essence, Plaintiff claims Shah committed

24  fraud in connection with the negotiation of the PSA and the accompanying agreements by

25  misstating the value of his assets.  The elements of a fraud claim are (1) a false representation,

26  concealment or non-disclosure, (2) knowledge of falsity, (3) an intent to defraud, (4) justifiable

27  reliance, and (5) resulting damages.  *Lazar v. Sup. Ct.,* 12 Cal. 4th, 631, 638 (1996).  The court

28  finds that Plaintiff did not prove that Shah made a false representation.

ORDER

-18-

Plaintiff alleges that Shah misrepresented the size of his assets when he claimed his net worth was $23.895 million. At trial, there was no substantial proof that Shah's original estimate of his assets was false. In July 2009, Shah gave his financial statement to Debtor in connection with the execution of the LOI. He testified that the cash balance he claimed was based on his bank statements. His real property value estimates were based on several things. For his hotel properties, he relied on a PFK report, a database routinely used in the hotel industry, and appraisals that were approximately one year old. He owns an office building, and relied on an annual bank appraisal for that property. For his home, he testified he is aware of the market and relied on discussions with realtors and flyers he had seen. He testified that no one on the seller side ever inquired where he obtained the valuation figures.

Plaintiff asks the court to conclude the $23.895 million figure was false for three reasons. First, Shah refused Debtor's requests that he obtain appraisals of his properties in response to the Bankruptcy Court's concerns about his ability to close the sale. In his testimony, Mr. Meyers indicated that he believed Shah was required by the PSA to supply the appraisals as requested. Mr. Meyers relied on the PSA, which required that Sevak "actively and fully assist Seller in obtaining Bankruptcy Court approval [of the sale] including without limitation by providing complete financial, experiential, and strategic information …" Second, Shah refused to execute a third amendment to the PSA that would have explicitly stated his net worth was $23.895 million. Finally, Shah eventually said he did not have $23.895 million in net assets.

Plaintiff is relying on the court to draw an inference that Shah was lying based on these facts. In other words, Plaintiff believes Shah had an obligation to provide appraisals and a further amendment to the PSA. His refusal to do so demonstrates he was being untruthful in July 2009 when he provided his financial statement. His statement later that he did not have $23.895 million in net assets, it is claimed, supports such an inference.

In the complicated financial world of 2008-09, this inference is too much for the court to accept. Shah testified that the original sale of the Hotel was for $70 million. He offered $46 million just a few months later. When GECC filed its motion for relief from stay, it claimed the

ORDER

-19-

Hotel was only worth $15 million. This is an astonishing drop in value for a property that had suffered no outward change. Shah was right to be concerned, based on the unprecedented plunge in property value, that his own assets might have diminished in value. Shah's contention that by December 2009, there was no point in giving Debtor further appraisals of his real properties because they would not appraise for the valuations he attributed to them earlier in 2009, is consistent with the dramatic decline in the Hotel's value at that same time.

Plaintiff offered no substantial independent evidence to show that Shah's net worth estimate was wrong. Because Plaintiff has not met the burden of proving the claim was false, the fraud claim must fail.

E.     Plaintiff's Third Claim for Relief was Abandoned

Plaintiff's First Amended Complaint alleged, in the Third Claim for Relief, that Shah intentionally interfered with the PSA. The court's October 31, 2012 Trial Scheduling Order required the parties to identify all disputed issues of fact and law, and indicated the parties' Pre-Trial Conference Statement would supersede the operative pleadings in the case. Plaintiff did not address or argue the intentional interference claim. The court treats that claim as abandoned under the terms of the Trial Scheduling Order and grants judgment in favor of Defendant Shah.

F.     Plaintiff's Fourth and Fifth Claims for Relief for Intentional Misrepresentation and Negligent Misrepresentation were not Supported by the Evidence

The elements of a cause of action for intentional misrepresentation are a knowingly false representation of a material fact, an intent to induce reliance, justifiable reliance by the plaintiff, and resulting damages. *Service by Medallion, Inc. v. Clorox Co.*, 44 Cal. App. 4th 1807, 1816 (1996).

The elements of a cause of action for negligent misrepresentation are (1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage. *Shamsian v. Atlantic Richfield Co.*, 107 Cal. App. 4th 967, 983 (2003). Negligent misrepresentation does not require knowledge of falsity. A defendant who makes false statements "honestly believing that they are

ORDER

-20-

1   true, but without reasonable ground for such belief . . . may be liable for negligent

2   misrepresentation." *Bily v. Arthur Young & Co.,* 3 Cal. 4th 370, 407-08 (1992).

3         For the same reasons that Plaintiff's fraud claim fails—a failure to satisfy the burden of

4   proving that Shah's claim to $23.895 million in assets was false—Plaintiff's fourth claim for

5   relief for intentional misrepresentation fails. Plaintiff did not prove that Shah knowingly made

6   a false representation because Plaintiff did not show Shah statement was false at the time it was

7   made. The fourth and fifth claims are dismissed.

8         G.    Defendant's Affirmative Defenses of Litigation Privilege does not bar Relief

9         Defendant contends that the First Amended Complaint must be dismissed due to the

10  "litigation privilege" at California Civil Code § 47. That section provides that a "privileged

11  publication or broadcast is one made … (b) in any judicial proceeding . . ." He argues that all

12  the pleadings he filed in the bankruptcy case, and any statement or negotiations conducted in

13  the bankruptcy case, are privileged. The court disagrees. Shah negotiated the sale of the Hotel

14  outside the presence of the Bankruptcy Court. The sale was a business deal between two

15  parties—Debtor and Shah. The fact that the sale was presented to the Bankruptcy Court for

16  approval does not immunize the discussions, negotiations, and agreements of the parties. The

17  purchase and sale of the Hotel was not part of a "judicial proceeding" in this sense, and § 47

18  cannot apply.

19        H.    Defendant's Affirmative Defense of Parol Evidence does not bar Relief

20        Defendant claims that the Parol Evidence Rule bars relief under the Fourth Claim for

21  Relief for intentional misrepresentations that may have been made in connection with the

22  negotiations of the PSA or Guaranty. Plaintiff properly observes that the Parol Evidence Rule,

23  codified at California Civil Code §§ 1625 and 1856, provides that when parties enter an

24  integrated written agreement, extrinsic evidence may not be relied upon to alter or add to the

25  terms of the writing. *See Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit

26  Ass'n,* 55 Cal. 4th 1169, 1174 (2013). Thus, "[w]here the language of a contract is clear and not

27  absurd, it will be followed." 1 B. Witkin, SUMMARY OF CALIFORNIA LAW, Contracts § 741

28  (10th ed. 2005). Section 1856, subdivision (f) establishes a broad exception to the operation of

ORDER

the parol evidence rule: "Where the validity of the agreement is the fact in dispute, this section does not exclude evidence relevant to that issue." According to the California Supreme Court, "[t]this provision rests on the principle that the parol evidence rule, intended to protect the terms of a valid written contract, should not bar evidence challenging the validity of the agreement itself. *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Ass'n,* 55 Cal. 4th at 1174. And, the Parol Evidence Rule does not bar introduction of evidence of fraudulent inducement. *Julius Castle Rest. Inc. v. Payne*, 216 Cal. App. 4th, 1423, ___ (2013).

The Parol Evidence Rule is no defense here. The contract-based claims (breach of contract, breach of the guaranty) are based on the terms of the agreements the parties negotiated. Plaintiff does not seek to vary those terms, so the rule has no application. The rule also would not apply to the fourth and fifth claims for fraud and negligent misrepresentation. Under the California Supreme Court's decision in *Riverisland Cold Storage, Inc.*¸ evidence of fraud would not be barred by California law. Regardless, as noted, the court has not found that Shah committed intentional or negligent fraud.

## III.  DAMAGES

The measure of damages for breach of contract to purchase real property is the benefit of the bargain, plus consequential damages. 1 Witkin, SUMMARY OF CALIFORNIA LAW, Contracts, § 901 (10th ed. 2005). California Civil Code § 3307 provides, "The detriment caused by the breach of an agreement to purchase an estate in real property is deemed to be the excess, if any, of the amount which would have been due to the seller under the contract over the value of the property to him or her, consequential damages according to proof, and interest."

Plaintiff has estimated damages by taking the agreed-upon sale price, and reducing it by the loan balance due GECC, for a rough measure of profit. From that, Plaintiff has adjusted for the costs of sale (brokerage fees and escrow fees), and added interest that would have been earned on a note Defendants were supposed to have executed. The court finds the calculation of damages to have been reasonable, supported by the evidence, and not contradicted. It therefore adopts $11,648,758 as the amount of damages for the breach.

ORDER

-22-

UNITED STATES BANKRUPTCY COURT
for the Northern District of California

**IV.     CONCLUSION**

The court will grant judgment in favor of Plaintiff and against Chandrakant Shah in the amount of $11,648,758 for breach of the guaranty.  Interest shall run on that balance from the date of entry of the judgment at the rate specified in 28 U.S.C. § 1961.

All other causes of action are dismissed.

Plaintiff shall submit a judgment consistent with this Order.

IT IS SO ORDERED.

**\*\*\* END OF ORDER \*\*\***

ORDER

**COURT SERVICE LIST**

**[ECF Recipients Only]**

ORDER

UNITED STATES BANKRUPTCY COURT
for the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28